**Annie WYATT, Appellant**

v.

**COMMONWEALTH of Kentucky, Appellee.**

No. 2005–SC–000184–MR.

Supreme Court of Kentucky.

April 19, 2007.

Donna L. Boyce, Appellate Branch Manager, Department of Public Advocacy, Frankfort, Counsel for Appellant.

Gregory D. Stumbo, Attorney General of Kentucky, Gregory C. Fuchs, Assistant Attorney General, Criminal Appellate Division, Office of the Attorney General, Frankfort, Counsel for Appellee.

Opinion of the Court by Chief Justice LAMBERT.

Upon a jury verdict, Appellant, Annie Wyatt, was convicted of two counts of criminal solicitation to commit murder,[1] and sentenced to fifteen years imprisonment on each count to run consecutively for a total of thirty years. She appeals to this Court as a matter of right, claiming that she was erroneously denied an in-

1. KRS 506.030; KRS 507.020.

struction on the defense of entrapment; that she was prejudiced by a key witness being allowed to testify to the legal elements of criminal solicitation; that her convictions violate principles of double jeopardy; and that the admission of certain hearsay testimony violated her Sixth Amendment right to confrontation.

The investigation leading to Appellant's convictions began when her drug customer, Buddy Ferguson, approached Detective Chris Garland of the Murray Police Department. Ferguson told Detective Garland that Appellant had mentioned something to him about "taking out" Detective Donald Bowman, a member of the Tri-County Drug Task Force. Upon Ferguson's agreement to act as a confidential informant, he was given money to purchase Lortabs from Appellant and instructed to follow up on her comment about Detective Bowman. He was wired before this transaction in an effort to obtain an audio recording. After meeting with Appellant, Ferguson returned with the Lortabs and told Detective Garland that Appellant had mentioned, again, wanting to kill Detective Bowman and his partner. Due to equipment failure, there was no audio recording.

Nearly one month after Ferguson's undercover drug purchase, the investigation proceeded with a plan for Ferguson to introduce an undercover officer to Appellant as an assassin. Ferguson called Appellant and told her that he had a friend from Chicago who was willing to handle the matter the two of them had discussed previously. During the conversation, Ferguson and Appellant set up a meeting for Ferguson to purchase some more Lortabs and to introduce Appellant to his Chicago friend.

Special Agent Curt Thielhorn of the Bureau of Alcohol, Tobacco and Firearms went undercover as Ferguson's "friend from Chicago" and the two met with Appellant in a commercial parking lot. Appellant got in the back seat of Ferguson's car where both audio and video recordings were attempted. However, much of the audio recording proved to be inaudible, particularly with respect to what Appellant said.

Agent Thielhorn began the conversation by telling Appellant he had heard that she was willing to pay with drugs for two police officers to be killed. He told Appellant that he had come in from Illinois and he did not have a gun or anything so he asked her how she wanted them killed. Appellant told him that she didn't care, "dead is dead." Appellant then said, "the easiest way," but she immediately stated that she had no money. Agent Thielhorn said that the easiest way to do it was to shoot the two officers with a gun, but he did not have one. At Ferguson's urging, Appellant admitted that she had a sawed-off shotgun and Ferguson asked if it could be used for the crime. Agent Thielhorn told Appellant that she would not get the gun back because he would have to dispose of it. Appellant again stated that she had no money, but Agent Thielhorn suggested that pills (Lortabs) would be acceptable payment. A discussion of payment amounts and methods began between Agent Thielhorn and Ferguson. Appellant responded, "I don't know, I'll have to think about it." Eventually, Agent Thielhorn arrived at a down payment amount of one-hundred pills. When specifically asked by Agent Thielhorn, Appellant agreed that it was a fair down payment.

The two men then asked Appellant about the physical characteristics of the intended victims as well as a description of their vehicles and Appellant gave them the requested information. Ferguson and Agent Thielhorn talked further about payment amounts and how Ferguson would

deliver the payments to him. However, a final purchase price was never agreed upon or even suggested. Agent Thielhorn provided Appellant with his cellular phone number and advised her to call him three days later, on Monday. He took Appellant's number as well. Then, Appellant got out of the car.

Appellant did not call Agent Thielhorn as he had suggested, so he attempted to call her twice but did not reach her. Appellant was arrested and charged with murder for hire on Friday, one week after the parking lot meeting, despite Appellant's failure to initiate any further contact or otherwise perform the purported agreement.

To establish motive, the Commonwealth presented the testimony of one of the intended victims, Detective Donald Bowman. Detective Bowman testified that he had been assigned to the Tri–County Drug Task Force from 2000 through 2004 and had investigated Appellant for doctor shopping to obtain drugs. He testified that while Appellant would not have been aware of his investigation of her, she was aware that he had investigated her son and his wife, and her daughter, for drug trafficking. During Detective Garland's testimony, the Commonwealth played portions of a videotaped interrogation of Appellant's daughter, Debra Wyatt. In an attempt to elicit incriminating statements from Debra, the interrogating officers had falsely told her that her mother had confessed to soliciting someone to murder Detectives Bowman and Vaden. In response, Debra told the investigators that her mother had said that it was Ferguson who wanted the two detectives murdered. Debra said that she responded to her mother that she didn't want to hear anything more

about it because Detective Bowman and his previous partner, Detective Mile, had saved her life by getting her off of drugs.

Neither Appellant nor confidential informant Ferguson testified at trial. The facts as stated hereinabove were established through the testimony of Detective Garland and Special Agent Thielhorn. The audio recording of the conversation between Thielhorn, Ferguson and Appellant was of poor quality and largely inaudible. While Thielhorn testified that Appellant said, "dead is dead," Thielhorn was unable to identify this statement on the audiotape recording of the meeting. The recording does reveal that Thielhorn asked Appellant how she wanted the victims killed, but the only audible response was from Ferguson, who stated "dead under the ground."

We first examine Appellant's contention that the trial court erred in failing to instruct on the defense of entrapment. Initially, we address a procedural point arising from the fact that Appellant simply rested her case after the Commonwealth presented its case-in-chief. As entrapment is a defense, the question arises whether a defendant must testify or present evidence in his case-in-chief to show an entitlement to the defense. Other jurisdictions are not in agreement on this issue.[2] While Kentucky has never explicitly confronted the issue, our jurisprudence implicitly recognizes that a defendant need not testify to avail himself of the defense. Rather, the evidence presented by the Commonwealth, including cross-examination of the Commonwealth's witnesses, may suffice to warrant an instruction on entrapment.

For example, in *Johnson v. Common-*

---

**2.** *See, e.g., U.S. v. Demma,* 523 F.2d 981 (9th Cir.1975). *Compare U.S. v. Jones,* 575 F.2d 81 (6th Cir.1978).

*wealth*,[3] the Court of Appeals reviewed the merits of the claim even though Appellant Johnson had not testified at trial. The Court of Appeals held that the trial court properly denied Johnson's requested instruction on entrapment, but in so deciding, the court analyzed the testimony given by the confidential informant who testified for the Commonwealth. Likewise, in *Green v. Commonwealth*,[4] the Court addressed the merits of Green's claim despite his failure to testify at trial. The Court upheld the trial court's denial of an entrapment instruction, but its decision was based on an examination of the behavior of the government agents. In other opinions, it is impossible to discern whether the defendant testified at trial, but in any event, our analysis has focused on the behavior of the government agents as developed though testimony of Commonwealth witnesses.[5]

■ We now hold, expressly, that a defendant need not testify in order to avail himself of the defense of entrapment. If the evidence presented is sufficient to support an entrapment instruction, it is of no consequence that such evidence is introduced during the Commonwealth's case-in-chief, through direct or cross-examination. As stated by the Court of Appeals in *Farris v. Commonwealth*,[6] "[I]n order for the defense to be raised, so as to call for an instruction placing the burden on the Commonwealth, there must be something in the evidence reasonably sufficient to support a doubt based on the defense in question.... Once there is evidence sufficient

to create a doubt, yes-then the state has the burden of proof and there must be an instruction so casting it."

■ Entrapment is an available defense when a defendant "was induced or encouraged to engage in [the criminal] conduct by a public servant or by a person acting in cooperation with a public servant seeking to obtain evidence against him for the purpose of criminal prosecution; and [a]t the time of the inducement or encouragement, he was not otherwise disposed to engage in such conduct."[7] If the public servant first conceived the criminal design and lured the defendant into its commission, the state is effectively estopped from convicting the defendant.[8] In *Sanders v. Commonwealth*,[9] an entrapment defense was required because the public servant had suggested the time for the crime (robbery), a specific escape route, and supplied the defendant with a disabled gun and a mask and because there was conflicting evidence of who initially developed the idea for the crime.

■ Turning to the instant case, Appellant must first show inducement or encouragement by either Agent Thielhorn, confidential informant Ferguson, or both. The phone conversations and meetings between Appellant and Ferguson were always initiated by Ferguson. Agent Thielhorn's testimony, the only participant in the three-person conversation who testified at trial, was not unambiguous with respect to who led the conversation. Thielhorn suggested the means, the payment method and quan-

**3.** 554 S.W.2d 401 (Ky.App.1977).

**4.** 488 S.W.2d 339 (Ky.1972).

**5.** *See, e.g., Dumon v. Commonwealth*, 488 S.W.2d 343 (Ky.1972).

**6.** 836 S.W.2d 451 (Ky.App.1992), *overruled on other grounds by Houston v. Com.*, 975 S.W.2d

925 (Ky.1998) (*quoting Brown v. Commonwealth*, 555 S.W.2d 252, 257 (Ky.1977)).

**7.** KRS 505.010.

**8.** *Sorrells v. United States*, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932).

**9.** 736 S.W.2d 338 (Ky.1987).

tity, and Ferguson urged Appellant to provide a weapon. While Appellant appears to have acquiesced in suggestions made by Thielhorn and Ferguson, she does not appear to have been the prime mover. Thus, we conclude there was sufficient evidence to constitute inducement or encouragement on the part of Agent Thielhorn and confidential informant Ferguson.

■ Upon the foregoing determination of evidentiary sufficiency of official inducement or encouragement, "where the government has induced an individual to break the law and the defense of entrapment is raised, the prosecution must prove beyond a reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by government agents."[10] Of course, evidence that a defendant was predisposed to commit the criminal act may be shown where the accused has engaged in a course of similar crimes, where the defendant was merely afforded an opportunity to commit a preconceived plan, or where willingness to commit the crime is apparent by ready compliance.[11]

■ Appellant had no history of engaging in crimes similar to those charged. In a portion of the videotaped interrogation of Debra Wyatt, Debra repeatedly stated that her mother had told her that Ferguson was the one who was planning the murder of the two officers. The principal evidence that the murder for hire plan originated with Appellant was through the hearsay testimony of police witnesses who relayed statements made by the non-testifying, confidential informant, Ferguson.

Finally, Appellant did not demonstrate a ready compliance when confronted with Agent Thielhorn's offer to murder the two officers. On the contrary, Appellant's response was, at best, ambivalent or equivocal. It was only upon her acquiescence in Agent Thielhorn's and Ferguson's continuous suggestions that an inference arose that she intended to solicit Agent Thielhorn to commit the murders.

In light of the conflicting evidence and inferences arising therefrom, it appears that an issue of fact was presented and that the trial court erred by denying Appellant's request for an instruction on the defense of entrapment.[12]

■ The Commonwealth argues that even if there was conflicting evidence concerning Appellant's predisposition to commit the crime, the denial of an instruction on entrapment was nevertheless appropriate pursuant to subsection two of the statute. KRS 505.010(2)(b) provides that "The relief afforded by subsection (1) is unavailable when [t]he offense charged has physical injury or the threat of physical injury as one (1) of its elements and the prosecution is based on conduct causing or threatening such injury to a person other than the person perpetrating the entrapment."

Though this provision was enacted as a part of the original penal code in 1975, we have discovered no Kentucky case which references it. Upon extensive review, we have discovered only two jurisdictions that have examined this provision, due, no doubt, in part to the fact that not all jurisdictions[13] have adopted the provision which is based on the Model Penal Code

---

10. *Commonwealth v. Day*, 983 S.W.2d 505 (Ky.1999) (*citing Jacobson v. United States*, 503 U.S. 540, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992)).

11. *Shanks v. Commonwealth*, 463 S.W.2d 312 (1971).

12. *See Sanders*, 736 S.W.2d 338.

13. *See, e.g., State v. Latham*, 910 S.W.2d 892 (Tenn.Cr.App.1995).

§ 2.18(3). Kentucky, along with Utah and New Jersey, has adopted the "unavailable" provision verbatim from the Model Penal Code.[14]

In *State v. Colonna*,[15] the Supreme Court of Utah rejected a literal construction of the physical injury or threat thereof requirement and held that implicit injury or threat of injury was sufficient. However, Colonna sought an entrapment defense, not for an inchoate crime, but for the crime of aggravated robbery. A required element under Utah's robbery statute is the use of force or fear. As a result, the Colonna court held that physical injury or threat of injury was implicit in the crime of aggravated robbery.

Conversely, the Superior Court of New Jersey confronted the provision's application to an inchoate crime, conspiracy to commit second-degree aggravated assault.[16] Threat of serious physical injury is an element of New Jersey's second-degree assault statute. In *State v. Soltys*,[17] relying on basic rules of statutory construction, the court concluded that Soltys was entitled to an entrapment defense. It recognized that the essence of conspiracy is the agreement to commit the crime and "here the conspiracy had to include an agreement to cause, or attempt to cause, serious bodily injury, but such an agreement itself constitutes neither a 'bodily injury' nor a 'threat' thereof."[18]

As with conspiracy, the essence of criminal solicitation is the demand or encouragement of another to engage in criminal conduct.[19] Criminal solicitation is an inchoate crime that is a separate and distinct offense from the underlying substantive offense that is its object.[20] Neither physical injury nor threat of physical injury is an element of this separate offense.[21] As such, KRS 505.010(2)(b) does not disqualify Appellant form the defense of entrapment.

■ Appellant also claims error with regard to Special Agent Thielhorn's testimony on the law of solicitation. Over objection, Special Agent Thielhorn was permitted to answer the question, "But, solicitation to commit murder does not require completion of the payment, does it?" to which he responded, "When I read the code, no, I did not see that the completion needed to be done, and I compared the state code to the federal code." The Commonwealth attorney continued, "And I believe you had legal advice on that, didn't you?" to which Agent Thielhorn replied that he had "legal advice on that and printed out many legal citations to read how it is done in various districts around the United States."

■ Admission of the foregoing testimony was in error, as "[A] witness generally cannot testify to conclusions of law."[22] Furthermore, the error was compounded by colloquy in the hearing of the jury. Specifically, when defense counsel asked Special Agent Thielhorn if a hit would have taken place if no drugs had changed

---

14. KRS 505.010(2)(b); Utah Code Ann. § 76–2–303(2); *N.J.S.A.* 2C:2–12c.

15. 766 P.2d 1062 (Utah1988).

16. *State v. Soltys*, 270 N.J.Super. 182, 636 A.2d 1061 (N.J.Super.Ct.App.Div.1994).

17. *Id.*

18. *Id.* at 1065.

19. KRS 506.030.

20. *See Braverman v. U.S.*, 317 U.S. 49, 53, 63 S.Ct. 99, 102, 87 L.Ed. 23, 27 (1942).

21. KRS 506.030.

22. *Tamme v. Commonwealth*, 973 S.W.2d 13 (Ky.1998) (*quoting Gibson v. Crawford*, 259 Ky. 708, 83 S.W.2d 1(1935)).

hands, the Commonwealth attorney objected and stated, "there is a misstatement of law on solicitation and the question propounds that misrepresentation of the law and solicits an answer from the witness that is not based on the law." Defense counsel responded, "the law has not been presented to the jury. We're asking about facts and what he would have done under the circumstances." Nevertheless, the trial court sustained the objection and stated, "the law does not require payment."

 While it is true that payment or consideration is not an element of the offense of criminal solicitation,[23] the question of payment is not irrelevant. The offense requires that a defendant "commands" or "encourages" another to engage in criminal conduct. Facts supporting or disputing "encouragement" are proper for the jury to hear. In the instant case, questions and arguments regarding payment or consideration, while not dispositive, were probative of whether Appellant "encouraged" Special Agent Thielhorn to commit the murders and also relevant to Appellant's defense that she lacked the requisite intent. However, the trial court effectively disposed of available inferences by informing the jury that payment was not required.

We have no doubt that if payment had been made, the Commonwealth would have properly used that fact as evidence of "encouragement." As there was no payment, Appellant should not have been prohibited from arguing that failure of payment sup-

ported her defense that there was no "encouragement."

Turning to Appellant's double jeopardy claim of error, the Constitution of Kentucky provides that "No person shall, for the same offense, be twice put in jeopardy of his life or limb."[24] Appellant contends that her convictions for two counts of criminal solicitation based on only one alleged act of "encouragement" violates double jeopardy principles that prohibit multiple punishments for the same offense.

Our Constitutional provision prohibiting double jeopardy parallels that of the Fifth Amendment of the U.S. Constitution. Even the most cursory review of double jeopardy jurisprudence reveals that attempts to develop a clear and coherent body of law construing the term "same offense" have been less than successful at both the state and federal levels.[25] However, we must discern whether two convictions are permissible under the criminal solicitation statute in view of the facts presented here.

KRS 506.110 prohibits convictions, based on the same course of conduct, for both the underlying crime and certain inchoate offenses involving the commission of the same crime. KRS 506.110(3) provides that if any of the inchoate offenses of attempt, solicitation, conspiracy, or facilitation occur in a single course of conduct designed to consummate the commission of the substantive crime, a person may be convicted

---

23. KRS 506.030.

24. Ky. Const. § 13.

25. *See, e.g., Ingram v. Commonwealth,* 801 S.W.2d 321 (Ky.1990), *overruled by Commonwealth v. Burge,* 947 S.W.2d 805 (1996); *Commonwealth v. Day,* 983 S.W.2d 505 (Ky.1999), *overruling Fuston v. Commonwealth,* 721 S.W.2d 734 (Ky.App.1986) and *Farris v. Commonwealth,* 836 S.W.2d 451 (Ky.App.1992) (all dealing with different aspects of double

jeopardy). For federal cases demonstrating the difficult application of double jeopardy principles, *see e.g., Blockburger v. U.S.,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932); *Ohio v. Johnson,* 467 U.S. 493, 500, 104 S.Ct. 2536, 2541, 81 L.Ed.2d 425 (1984); *Grady v. Corbin,* 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990), *overruled by U.S. v. Dixon,* 509 U.S. 688, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993).

of only one of the enumerated inchoate offenses. Yet, neither of these prohibitions applicable to inchoate offenses addresses the permissibility of multiple convictions for one inchoate crime where the commission of more than one underlying substantive offense is contemplated. KRS 506.020(2) does address this issue, but only with respect to the inchoate crime of conspiracy. The provisions states, "A person who conspires to commit more than one (1) crime, all of which are the object of the same agreement or continuous conspiratorial relationship, is guilty of only one (1) conspiracy." This provision is not applicable where one or more, but not all, of the object crimes are committed.[26] In such a case, a conviction may be had for the commission of the crimes that were completed along with a conviction for the agreement to commit the remaining, but uncommitted crime(s).

Appellant contends that the rationale of KRS 506.020(2) should apply to the offense of criminal solicitation. However, the Commonwealth counters that there is no statutory provision analogous to KRS 506.050(2) which applies to criminal solicitation. Whether one act of solicitation to murder multiple victims permits multiple solicitation convictions based on the number of victims appears to be an issue of first impression in this Court. We are not unmindful of this Court's decision in *Putty v. Commonwealth*,[27] wherein the facts were the exact converse of those in the instant case. Putty was convicted of multiple counts of criminal solicitation for multiple, separate acts of soliciting the murder of the same victim, but the issue presented here does not appear to have been raised.

A review of other jurisdictions provides little guidance. With the exception of *Meyer v. State*,[28] a decision of the Maryland Court of Special Appeals, and *People v. Vandelinder*,[29] which adopted *Meyer*'s approach, we have discovered no reported cases helpful to our analysis of this issue.[30] The *Meyer* court declined to adopt a bright line rule that encouraging another to kill more than one person constitutes distinct incitements, permitting multiple convictions for criminal solicitation. Rather, the *Meyer* court held that the determination should focus on the number of incitements, not the number of victims. Meyer's multiple convictions were upheld on the basis that:

> The executions were to occur at different times and places, and possibly by different means and executioners; different (and cumulative) fees were to be paid for these acts. Different motives were involved. Even as between the two officers, the evidence permitted a fair inference that most of these distinguishing attributes were present. In short, the evidence sufficed to permit a finding that it was not a "lump sum"

---

**26.** KRS 506.110(2).

**27.** 30 S.W.3d 156 (Ky.2000).

**28.** 47 Md.App. 679, 425 A.2d 664 (1981).

**29.** 192 Mich.App. 447, 481 N.W.2d 787 (1992).

**30.** Various appellate districts in California have rendered conflicting decisions on the issue, even within the same district. See *People v. Cook*, 151 Cal.App.3d 1142, 199 Cal. Rptr. 269 (1 Dist.1984) (agreeing with the *Meyer* approach), *People v. Miley*, 158 Cal. App.3d 25, 204 Cal.Rptr. 347, 351 n. 4 (2 Dist.1984) (approving a pre-trial consolidation based on the fact that the "solicited crimes were all part of one package") and *People v. Morocco*, 191 Cal.App.3d 1449, 237 Cal.Rptr. 113 (4 Dist.1987) (striking second count of solicitation based on *Cook* and *Miley*); Compare *People v. Davis*, 211 Cal. App.3d 317, 259 Cal.Rptr. 348, 352 (1 Dist. 1989) (holding that convictions may be had on "as many counts of solicitation to murder as there are identifiable victims").

singular deal, but separate and independent incitements to commit four separate and distinct acts of murder against specific named individuals; and thus, neither the separate convictions nor the separate and consecutive sentences were inappropriate.

■ Our decision in *Putty* is not inconsistent with this approach as Putty clearly solicited two different people in four different conversations to murder the same victim. Each time Putty's solicitation was made, the offense was completed. The next solicitation constituted a new incitement and thus a new offense. The reasoning in *Meyer* seems to be sound, and applying it in the instant case, a different conclusion seems to be compelled. Here, there was only one solicitation conversation. The intended victims were partners and traveled together, and the place, means, and executioner were to be the same; one fee was to be paid; the alleged motive was the same; and with the exception of their physical descriptions, the victims were referred to collectively.

■ Upon our conclusion that Appellant's alleged solicitation constituted a single course of conduct, we must determine whether that single course of conduct established one or more solicitation offenses.

Under the federal conspiracy statute, the Supreme Court of the United States has explained:

Whether the object of a single agreement is to commit one or many crimes, it is in either case that agreement which constitutes the conspiracy which the statute punishes.... [31]

A conspiracy is not the commission of the crime which it contemplates, and neither violates nor 'arises under' the statute whose violation is its object.[32]

Likewise, whether the object of a single act of encouragement is to commit one or many crimes, it is the act of encouragement which the solicitation statute punishes. We reiterate that solicitation is a separate and distinct offense from the underlying substantive offense that is its object.[33] While our authority for these propositions is drawn from the analogous offense of conspiracy, it is not inappropriate as the offense of criminal solicitation may be logically viewed as an imperfect conspiracy or as an attempt to conspire.[34] The offense of criminal solicitation emerged from the offense of criminal conspiracy,[35] and was designed to address situations where one party offered to conspire with another, but the other rejected the offer.[36] Criminal solicitation simply recognizes that a refusal of the other to participate does not reduce the mental culpability of the solicitor.[37] By the same token, however, a refusal by the person solicited to participate should not result in greater punishment than if there had been a completed agreement.

---

31. *Braverman*, 317 U.S. at 53, 63 S.Ct. 99.

32. *Braverman*, 317 U.S. at 54, 63 S.Ct. 99 (*citing United States v. Rabinowich*, 238 U.S. at 87–89, 35 S.Ct. 682, 684, 685, 59 L.Ed. 1211 (1915); *United States v. McElvain*, 272 U.S. 633, 638, 47 S.Ct. 219, 220, 71 L.Ed. 451(1926)).

33. See *Braverman*, 317 U.S. 49, 63 S.Ct. 99 (holding that conspiracy punishes the agreement to engage in criminal conduct, not the criminal conduct that is the object of the agreement).

34. Ira P. Robbins, *Double Inchoate Crimes*, 26 HARV. J. ON LEGIS. 1 (1989).

35. KRS 506.030, cmt. (1974).

36. *Id.*

37. *Id.*

As applied to this case, had Special Agent Thielhorn been an actual assassin and accepted Appellant's alleged solicitation, thereby creating an agreement between the two, Appellant would have been subject to prosecution for one count of conspiracy, not two counts of solicitation. KRS 506.050(2) would allow only one charge of conspiracy to be brought. It would be illogical to obtain a different result where the conspiracy fails and the only crime committed is solicitation. As we have determined that there was only one act of encouragement, Appellant may be convicted of only one act of solicitation.

For her final claim of error, Appellant contends that the hearsay testimony of Detective Garland whereby he repeated statements made by the confidential informant, one who did not testify at trial, violates her confrontation clause rights.

This claim is unpreserved. As we are reversing for a new trial on other grounds, we will forego a review for palpable error and rely on counsel to properly present the issue when and if it arises on retrial.

For the foregoing reasons, Appellant's convictions are reversed and the case is remanded for further consistent proceedings.

CUNNINGHAM, MCANULTY, MINTON, NOBLE, SCHRODER, and SCOTT, JJ., concur.